IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2019

# IN RE TRAVIS R.[1]

**Appeal from the Juvenile Court for Jefferson County**
**No. 18-00670     Dennis Roach, II, Judge**

_____

## No. E2019-01024-COA-R3-PT
_____

The Tennessee Department of Children's Services ("DCS") filed this petition to terminate the parental rights of a father to his seven-year-old son. The father was incarcerated for most of the child's life, and he was serving a three-year sentence in New Jersey at the time of the final hearing. The mother surrendered her parental rights after the child was found dependent and neglected and placed in foster care. Although the father was scheduled to be released from prison, he had not seen the child in over five years. The trial court found that the father had abandoned the child by failing to visit during the four months before his incarceration and exhibiting a wanton disregard for the child's welfare by engaging in criminal behavior. The trial court also found that the father's conduct during the child's life failed to manifest an ability and willingness to assume custody and that placing the child in the father's custody would pose a risk of substantial harm to the child. Moreover, the court found that terminating the father's rights would be in the child's best interests because there was no substantial relationship, and the father had no plans for employment or housing after his release. The father contends that the trial court's findings did not constitute clear and convincing evidence that termination of his rights was in the child's best interests. We find the evidence does not preponderate against the trial court's findings of fact and affirm its conclusion that DCS proved its case by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

_____

[1] This Court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

Dana L. Lesley, Dandridge, Tennessee, for the appellant, William R.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan Keith Crews, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

William Keith Repass, Guardian Ad Litem, Dandridge, Tennessee, for the minor child, Travis R.

## OPINION

Travis R. ("the Child") was born in January 2012 to Crystal G. ("Mother")[2] and William R. ("Father"). In December 2015, DCS placed the Child in protective custody with his maternal aunt, Jessica Ellis. Two years later, in December 2017, DCS removed the Child from Ms. Ellis's home due to, *inter alia*, a lack of supervision and Ms. Ellis's substance abuse. At the time, Father was incarcerated in New Jersey, where he lived since 2013. After an unsuccessful effort to place the Child back in Mother's custody, DCS filed a petition for termination of Mother and Father's parental rights. Mother surrendered her rights in March 2019, and the petition against Father proceeded to a final hearing in April 2017.

At the hearing, DCS presented the testimony of the Child's Foster Care Case Manager, Jonathan Cruz. Mr. Cruz testified that the Child was behind in school and suffering from attention deficit hyperactivity disorder and undiagnosed focal seizures when DCS placed him in foster care. The Child began taking medication, and he was back on par with his grade level. By that time, the Child had been in custody for over fifteen months but did not have a prospective adoptive family. Mr. Cruz stated that DCS could not make the Child available for adoption until they obtained full guardianship.

Father participated by telephone during the hearing and testified that he had been close to the Child until returning to New Jersey in 2013. Father admitted, however, that he had been arrested several times in Tennessee after the Child's birth. Shortly after the Child's birth, Father was arrested in Cocke County for public intoxication and resisting arrest. After a few days in jail, Father was released on probation. Father also admitted that he was arrested in Scott County and Jefferson County, and he spent six months in jail

[2] Mother voluntarily surrendered her parental rights in March 2019 and is not a party to this appeal.

- 2 -

for violating his probation. Then, in April 2013, Father pleaded guilty in Morgan County to resisting arrest, unlawful possession of a weapon, and failure to register as a sex offender. Finally, in July 2013, Father pleaded guilty in Morgan County to another charge of violation of probation. Around this time, Father discovered he had a pending warrant for his arrest in New Jersey and requested Tennessee law enforcement to extradite him.

On June 21, 2013, Father surrendered to New Jersey authorities. According to the certified copy of his conviction, Father thereafter pleaded guilty to aggravated criminal sexual contact and failure to notify the State of his change in address in 2011. He was released from prison in December 2014 and placed back on probation. For the next two years, Father lived in New Jersey. He testified that he had a job and sent money "a couple of times" for the Child when Ms. Ellis needed it.

In January 2017, however, Father returned to prison on charges for sexual assault and endangering the welfare of his ex-girlfriend's child in 2007. Father pleaded guilty to the child endangerment charge and was sentenced to a three-year prison sentence. The New Jersey court, however, determined that Father was not a good candidate for probation due to his "history of probationary violations" and exposure "to the full array of criminal sanctions including diversion, probation, and incarceration[,] none of which ha[d] dissuaded him from continued anti-social criminal behavior." By that time, Father was 55 years old and had an adult criminal record that comprised 44 arrests, 10 misdemeanor convictions, 12 felony convictions, two probation violations, and four parole violations.[3]

Father testified that he returned to New Jersey to "take care of [his] past wrongs" so he could "start a new life with Travis." He was expecting to be released on parole in May 2019, but he did not know the conditions of his release. Still, he testified that he could transfer his parole to Tennessee, where he had family. He also said that he would get housing and a job, and sign up for an alcohol and drug assessment and a mental evaluation. According to his prison records, Father registered for two classes on January 7, 2019, one entitled "Successful Transition and Reentry" and one entitled "Successful Employment and Lawful Living." But Father testified that he had not been able to attend because there was a six-month wait period. Father admitted that he did not have a relationship with the Child and did not know how long it would take to be in a position to care for the Child.

---

[3] New Jersey classifies offenses as "disorderly" and "indictable" rather than "misdemeanors" and "felonies," respectively. *See, e.g.*, N.J. Stat. Ann. § 2C:1-4. It is unclear whether the New Jersey court's recitation of Father's criminal record includes the convictions from Tennessee.

On May 23, 2019, the trial court entered an order terminating Father's parental rights. The court found that DCS proved three grounds by clear and convincing evidence: (1) abandonment by failure to visit; (2) abandonment by wanton disregard; and (3) failure to manifest ability and willingness to assume custody of the Child. It also found that termination was in the Child's best interests based on Father's failure to adjust his circumstances, his failure to maintain visitation or otherwise establish a meaningful relationship with the Child, and because of Father's criminal history. This appeal followed.

Father raises only one issue on appeal, contending that the trial court's findings did not constitute clear and convincing evidence that termination was in the Child's best interests.

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); Tenn. Code Ann. § 36-1-113(c). And trial courts must make specific findings of fact and conclusions of law. Tenn. Code Ann. § 36-1-113(k). "[S]pecific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). When a trial court fails to comply with this requirement, "appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law." *Id.*

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *Id.*

## ANALYSIS

As an initial matter, Father does not challenge the trial court's determination that grounds existed for terminating his parental rights. Nonetheless, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re*

*Carrington H.*, 483 S.W.3d at 525–26. Thus, we will first review the trial court's determination that grounds existed for terminating Father's parental rights.

## I.  GROUNDS FOR TERMINATION

The trial court found that DCS proved three grounds by clear and convincing evidence: (1) abandonment by failure to visit; (2) abandonment by wanton disregard; and (3) failure to manifest an ability and willingness to parent. We will address each in turn.

### A. Failure to Visit

As for abandonment by failure to visit, the court found that Father failed to visit the Child during the four months before his incarceration based on Father's testimony that he had not seen the Child since 2013.

When a parent "is incarcerated at the time of an action or proceeding to declare a child to be an abandoned child," a finding of abandonment for failure to visit may be based on the parent's failure to visit "for four (4) consecutive months immediately preceding such parent's or guardian's incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv). The record indicates that Father was incarcerated on January 18, 2017.[4] Thus, the relevant time period is from September 18, 2016, to January 17, 2017.

It was undisputed that Father did not visit the Child during this time. Moreover, as discussed in more detail later, although Father professed a willingness to assume custody at the final hearing, Father did not explain why he stayed in New Jersey from 2014 to 2016, during which the Child was removed from Mother's care and placed with Ms. Ellis. Father testified that he communicated with the Child while in Ms. Ellis's care, but he also testified that he was not aware of the change in custody and stated that he sent money "a couple of times" when requested by Ms. Ellis. The record also established that Father had the ability but made no effort to visit the Child, and Father provided no justification for not doing so.

Accordingly, we affirm the trial court's determination that DCS proved this ground by clear and convincing evidence.

---

[4] Father's Judgment of Conviction & Order for Commitment provides that Father was arrested on January 19, 2016, but it states that Father's time in custody began on January 18, 2017.

## B. Wanton Disregard

The court also found that Father exhibited a wanton disregard for the Child's welfare because he had been convicted of multiple crimes in two states since the birth of the Child and had been in prison in New Jersey since 2016.

Under this ground, a court may deem a parent to have abandoned his or her child when the parent "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This requires courts "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. We have explained that "a parent's criminal behavior does not automatically constitute wanton disregard for the welfare of a child," but such behavior "may constitute such wanton disregard under the appropriate circumstances." *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014). When considering whether a parent's criminal conduct constitutes wanton disregard, we consider "the severity and frequency of the criminal acts." *Id.*

It was undisputed that Father was arrested multiple times in Tennessee after the Child's birth. Although Father testified that he returned to New Jersey to answer for crimes committed before the birth of the Child, he admitted that he violated the terms of his probation again after being released in 2014. These acts, when coupled with his history of criminal behavior before the Child's birth, demonstrate a pattern of conduct that renders Father unfit to parent the Child. Accordingly, we find the trial court's determination on this ground is supported by clear and convincing evidence.

## C. Failure to Manifest Ability and Willingness

Finally, the trial court found that Father failed to manifest an ability and willingness to assume custody or financial responsibility for the Child and that placing the Child in Father's custody would pose a risk of substantial harm to the Child's welfare. The court reasoned that Father had been convicted multiple times in multiple jurisdictions since the Child's birth, did not try to parent the Child when he was out of prison, and failed to provide proof that he provided financial support for the Child. As a result, the court concluded that Father was "a complete stranger to the Child" and had "shown no real ability or interest in parenting" the Child.

Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical

custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). When evaluating ability, we focus "on the parent's lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at \*5 (Tenn. Ct. App. Oct. 26, 2018). "When evaluating willingness, we look for more than mere words." *Id.* "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* When looking at the risk of substantial harm, we consider whether placing the Child in the parent's custody would present a "real hazard or danger that is not minor, trivial, or insignificant." *Id.* at \*6 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

We agree with the trial court's conclusion that Father failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the Child. Although Father professed a willingness to assume custody at the final hearing, Father did not explain why he stayed in New Jersey from 2014 to 2016, during which the Child was removed from Mother's care and placed with Ms. Ellis. Although Father testified that he was not aware of the change in custody, he also testified that he communicated with the Child while in Ms. Ellis's care. Moreover, he stated that he sent money "a couple of times" when Ms. Ellis requested it, but he took no action whatsoever to assume custody of the Child during that time. Further, Father provided no evidence of his ability to assume custody of the Child following his release from prison.

Therefore, Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Furthermore, the record established that placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the welfare of the Child. Accordingly, we affirm the trial court's determination that DCS proved this ground by clear and convincing evidence.

## II. BEST INTERESTS

Having affirmed the trial court's conclusion that grounds existed for terminating Father's parental rights, we turn to the court's conclusion that terminating Father's rights was in the Child's best interests. The court found termination was in the Child's best interest because of Father's speculative living circumstances, his lack of meaningful interaction with the Child since 2013, his failure to provide support, and his extensive criminal history. Father contends that the trial court failed to consider his past relationship with the Child, his return to New Jersey to answer for the outstanding warrant, his subsequent efforts to maintain contact with the Child, and his plans for starting a new life upon release. Father also suggests that his ability to maintain contact

with the Child was hampered by a no-contact provision in the 2017 protective-custody order.

"In addition to presenting clear and convincing evidence establishing at least one statutory ground warranting the termination of a biological parent's parental rights," a petitioner must "present clear and convincing evidence that terminating the parent's rights is in the best interests of the affected child." *In re Bernard T.*, 319 S.W.3d 586, 606 (Tenn. 2010); Tenn. Code Ann. § 36-1-113(c). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010). Clear and convincing evidence "establishes that that truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence," and "[i]t produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted).

While the combined weight of the evidence must meet the clear and convincing standard, facts considered in the best-interests analysis need be proven only "by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015)). The best-interests analysis "is guided by a consideration of the factors listed in Tenn. Code Ann. § 36-1-113(i)." *In re Bernard T.*, 319 S.W.3d at 606.

When considering the statutory factors, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. "A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i)." *In re Audrey S.*, 182 S.W.3d at 878. "When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

Tennessee Code Annotated § 36-1-113(i) provides a list of nine non-exclusive factors for courts to consider when making the best interests determination. The analysis is not a rote examination of each factor followed by "a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.*

To begin with, we find Father's argument that his ability to establish a relationship with the Child was hampered by the no-contact order is without merit for two reasons. First, "[f]rom the child's point of view, the reasons for the lack of interaction matter

little." *Id.* Second, the record shows that the no-contact order was quickly superseded by an order permitting visitation. The order specifying that Father was to have no contact with the Child was entered on December 6, 2017, but it was quickly superseded by the court's order of December 7, 2017, in which the court expressly granted visitation to both Mother and Father. Thus, there was nothing to stop Father from sending correspondence or calling the Child. Moreover, there is no evidence that Father even attempted to contact the Child at any point after his incarceration in January 2017.

We also find that the evidence of Father's prior relationship does not preponderate against the trial court's finding that Father had no relationship as of the date of the final hearing. The record shows that the Child was 18 months old when Father returned to New Jersey. Of those 18 months, Father was incarcerated for at least six. After arriving in New Jersey, Father was immediately incarcerated for another eighteen months. He was released in late 2014. Father correctly points out that he testified about having telephone conversations and exchanging pictures with the Child until he went back to prison, which occurred in January 2017. But Father's testimony was that his correspondence occurred while the Child was in Ms. Ellis's custody—which was after December 2015. Thus, Father's own testimony supports the inference he was out of contact with the Child from June 2013 to December 2015.

Any inference that Father developed a relationship with the Child due to his correspondence from December 2015 to January 2017 is rebutted by Mr. Cruz's testimony that the Child never asks about Father. Thus, even if Father had a relationship with the Child in the past, the evidence does not preponderate against the court's finding that Father *has* no meaningful relationship with the Child. *See In re I.E.A.*, 511 S.W.3d 507, 519 (Tenn. Ct. App. 2016) (finding that "the children were removed from [the m]other at such a young age that no meaningful parent-child relationship has formed.").

Finally, the trial court's failure to make any findings about Father's plans to start a new life upon release was harmless. Given the other facts in the record, Father's good intentions are insufficient to create "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) (quoting *In re M.J.B.*, 140 S.W.3d at 653). We considered similar circumstances in *In re Navada N.*:

> It is clear to this Court that it would not be safe for Navada to return to Father at any point in the near future, as evidenced by his sprees of criminal conduct and current incarceration. Although we commend Father for taking advantage of classes offered in his jail, his efforts to parent Navada while not incarcerated were minimal to none. Father admitted that he did not pay child support while Navada was in custody. Similarly, Father's plans upon his release, expected six months after trial, remained uncertain. Father

mentioned living in a halfway house for six months after release, which would be reasonable given his situation; however, from the point of view of Navada, we must conclude that Navada has waited long enough for Father to be a parent to her. Father has not seen Navada since Navada was removed to DCS custody due to his violation of the IPA, nearly a year and a half prior to trial. It is simply not in her best interest to wait longer to foster a relationship with Father that may never occur.

498 S.W.3d 579, 608 (Tenn. Ct. App. 2016).

Here, Father has expressed a commitment to putting his past behind him. We commend his goals and sincerely hope for his success. Nonetheless, the practical details of Father's return to society were uncertain. There was no certainty of where Father would stay, how he would find employment, or even which state he would reside in. Viewing the circumstances from the Child's point of view, we conclude the evidence clearly and convincingly showed termination of Father's rights was in the Child's best interests.

## IN CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant.

_____
FRANK G. CLEMENT JR., P.J., M.S.